TFH: USAO 2016R00734

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CASE NO. GLS-19-1921 |
| | * | |
| KAIRI MUGADDIM, | * | (Conspiracy to Commit Hobbs Act |
| | * | Robbery, 18 U.S.C. § 1951; Hobbs |
| Defendant | * | Act Robbery, 18 U.S.C. § 1951; Using, |
| | * | Carrying, and Brandishing Firearm |
| | * | in Relation to a Crime of Violence, |
| | * | 18 U.S.C. § 924(c)) |
| | * | |

\*\*\*\*\*\*\*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Karen Cody, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. This Affidavit is made in support of a criminal complaint and arrest warrant for **KAIRI MUGADDIM ("MUGADDIM")** for violations of 18 U.S.C. § 1951 (Hobbs Act Robbery, Conspiracy to Commit Hobbs Act Robbery) and 18 U.S.C. § 924(c) (Using, Carrying, and Brandishing a Firearm in Relation to a Crime of Violence).[1]

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed for approximately ten years. For the majority of my tenure, I was assigned to a Violent Crimes Task Forces (VCTF) in the Washington Field Office, and for over the last 4 years have been assigned to a Cross Border Task Force in the Baltimore Division. In that time, I have

---

[1] On March 25, 2019, the Grand Jury sitting in the District of Maryland charged **MUGADDIM** by Superseding Indictment with five counts involving the same violations of 18 U.S.C. § 1951 and 18 U.S.C. § 924(c) described in this affidavit. On July 25, 2019, the Hon. Theodore Chuang granted **MUGADDIM**'s motion to dismiss without prejudice to refile charges.

investigated numerous criminal violations, to include: gang related crimes of violence, international and domestic kidnappings, bank robberies, attempted assassinations of government officials, violent crimes on government reservations, homicides, sexual assaults and extraterritorial crimes (including war crimes, torture, and murder). Presently, I am assigned to the Baltimore Division, Rockville Resident Agency, where I investigate a variety of criminal violations, including gang related violent crimes. Prior to becoming an FBI Special Agent, I was an Auditor for the FBI from in or about 2004 through in or about 2009.

3. As an FBI Special Agent, I have received special training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant applications and procedures, evidence collection procedures, and crime scene management. In the course of my training and experience, I have become familiar with the methods and techniques associated with bank robbers, violent criminals, the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of investigative techniques including interviewing informants and cooperating witnesses; conducting physical surveillance, consensual monitoring and recording of communications; and preparing and executing search and arrest warrants. Based on my training and experience, I was certified as an Adjunct Instructor for the FBI in the fields of Crime Scene Management and Bank Robberies.

4. The facts in this affidavit are in part, from my personal observations, training and experience, and from information obtained from other law enforcement officers and witnesses. I respectfully submit that based on the facts set forth herein, there is probable cause to believe that **MUGADDIM** committed the following violations of federal law in the District of Maryland and elsewhere:

a. **Count One**: Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951;

b. **Count Two**: Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951 (May 25, 2017);

c. **Count Three**: Use, Carry, and Brandish a Firearm During and in Relation to a Crime of Violence (Count Two), in violation of 18 U.S.C. § 924(c)(1)(A)(ii);

d. **Count Four**: Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951 (June 13, 2017); and

e. **Count Five**: Use, Carry, and Brandish a Firearm During and in Relation to a Crime of Violence (Count Four), in violation of 18 U.S.C. § 924(c)(1)(A)(ii).

5. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that certain federal violations have occurred.

## PROBABLE CAUSE

6. The FBI—with assistance from the Takoma Park Police Department ("TPPD"), Laurel Police Department ("LPD"), Metropolitan Police Department, Washington, D.C. ("MPD"), Anne Arundel County Police Department ("AACPD"), and other agencies—is investigating several armed robberies of armored trucks. For reasons described herein, law enforcement believes that **MUGADDIM** is one of the armed robbers.

### April 19, 2017: Armored Truck Robbery in Washington, D.C.

7. On or about April 19, 2017, the FBI and the MPD responded to an attempted armored truck robbery at Business 1, a check cashing business in Washington, D.C., which occurred at approximately 11:40 a.m. According to a driver of the armored truck (hereinafter, "V1"), two

black males exited a parked black Dodge Avenger and immediately brandished assault rifles. V1 was forced to hand over a tote bag, which the robbers kept as they fled in the Dodge Avenger. Surveillance photographs obtained by law enforcement show one of the robbers was a black male with dreadlocks, a thin build, and wearing a light colored top, dark pants, and a dark cloth covering his face. The other robber was a tall black male, wearing dark clothing and a dark cloth covering his face. The tote bag handed over by V1, however, did not contain any U.S. currency.

8. The armored truck was equipped with a video security system that recorded events both inside and outside of the vehicle. Officers reviewed the external video and saw that the same Dodge Avenger involved in the robbery was also on scene when the armored truck made a previous stop immediately before Business 1, at approximately 11:32 a.m.

9. Further investigation revealed that the Dodge Avenger had been stolen on or about February 10, 2017.

### May 25, 2017: Armored Truck Robbery in Laurel, Maryland

10. On or about May 25, 2017, the FBI and LPD responded to an armored truck robbery at Business 2, a bank in Laurel, Maryland, which occurred at approximately 12:33 p.m. According to the armored car employee who was a victim of the robbery (hereinafter, "V2"), when V2 came out of Business 2 after dropping off U.S. currency, V2 was confronted by two black males, both brandishing assault rifles. V2 dropped to the ground and also dropped a tote bag V2 was carrying. The two robbers took the bag and fled in the same Dodge Avenger used in the robbery on April 19, 2017. One of the robbers was described by V2 as tall with dreadlocks, a medium/slim build, and wearing dark clothing with something dark covering his face. The other male was described by V2 as shorter than the other robber and also wearing dark clothing. The tote bag dropped by V2 and taken by the robbers, however, did not contain any U.S. currency.

**Dodge Avenger Found**

11. At some point within a week following the robbery on May 25, 2017, law enforcement recovered the Dodge Avenger, which had been abandoned approximately one mile away from the May 25, 2017, robbery location.

12. Pursuant to written consent provided by its registered owner, the Dodge Avenger was processed for evidence on or about June 1, 2017, by the FBI Washington Field Office Evidence Response Team ("WFO ERT"). WFO ERT took several swabs from the vehicle for possible DNA collection, and also recovered items including a plastic bottle, sunglasses, black glove, screw driver, and tooth brush. In addition to potential forensic evidence recovered, two receipts were found inside, which showed transactions made after the vehicle had been stolen on February 10, 2017. One receipt was for a purchase at Business 4, a car parts store in District Heights, Maryland, dated March 29, 2017, at 8:54 p.m. Video surveillance from Business 4 for the date and time on the receipt showed an individual whom law enforcement now recognizes to be **MUGADDIM** making a cash purchase for a roll of window tint.

13. According to the owner of the Dodge Avenger, the windows of the Dodge Avenger were not tinted prior to it being stolen. At the time of the robbery, witness statements and surveillance footage indicate that the windows of the Dodge Avenger were tinted. Law enforcement believes that the tint purchased by **MUGADDIM** from Business 4 was applied to the Dodge Avenger between the date the car was stolen and the date the car was used in these crimes.

**June 13, 2017: Armored Truck Robbery in Laurel, Maryland**

14. On or about June 13, 2017, the FBI and AACPD responded to an armored truck robbery at Business 3, a bank automated teller machine ("ATM") in Laurel, Maryland, which occurred at approximately 1:13 p.m. V2 again was a victim of the robbery. According to V2, the robbery

occurred when V2 exited the rear of the truck carrying four ATM money canisters (three canisters in one bag and holding a fourth). Each of the four canisters contained about $40,000 in U.S. currency, and were to be placed into the ATM. The driver of the armored truck remained in the truck. As V2 approached the front door of Business 3, a black male exited a white sports utility vehicle ("SUV") carrying a black trash bag, and approached V2. The male then removed an object that appeared to be an assault rifle from the black trash bag and demanded that V2 hand over the canisters. V2 complied and dropped what she was holding, including the canister she was holding and the bag containing the canisters, and the male fled back to the SUV taking only the bag dropped by V2. The body camera worn by V2 recorded the robber, who appears in that recording to be a black male with a slim build, wearing a light colored top, dark pants and what appears to be a mask (covering his face). V2 described the robber as having dreadlocks. The assault rifle was described by the driver of the armored truck as an AK-47 style weapon. Surveillance footage from nearby businesses obtained by investigators revealed that two suspects exited the white SUV, despite V2's description of a sole suspect.

15. Immediately following the robbery, a blue tank top and black trash bag were observed and seized from the location where the white SUV had parked. Surveillance video shows that the black trash bag was not present in the area prior to the arrival of the white SUV. The blue tank top and black trash bag were processed by the Anne Arundel County Crime Laboratory ("AACCL") for forensic evidence following the robbery. The AACCL recovered latent prints located on the black trash bag, which were subsequently sent to the FBI's laboratory in Quantico, Virginia, for print comparison.

### SUV Found

16. A white 2006 Infiniti FX35 SUV ("the Infiniti") was discovered abandoned a short distance from the robbery. A records check of the Infiniti confirmed that the registered owner had reported the Infiniti stolen on the May 30, 2017.

17. Pursuant to written consent provided by its registered owner, the Infiniti was processed for evidence between on or about June 19, 2017, and on or about June 23, 2017, by the Baltimore FBI Evidence Response Team ("BA ERT"). BA ERT recovered armored car company packaging materials from the back seat of the Infiniti that contained a Business 3 ATM receipt for $160,000. BA ERT took several swabs from the vehicle for possible DNA collection and recovered forensic evidence.

### Cell Tower Data

18. Records received from Sprint Corporation ("Sprint") indicate that the cellular telephone assigned call number (202) XXX-0754 is subscribed to "KAI MUGADDIM."

19. On or about June 26, 2017, a federal magistrate judge issued an order pursuant to 18 U.S.C. § 2703(d) concerning cellular telephone tower data from several locations and times relevant to this investigation. Analysis of these records shows that a cellular telephone associated with call number (202) XXX-0754 utilized cellular towers and sectors on those towers consistent with providing cellular service in the area of Business 4 on or about March 29, 2017, at the approximate time the window tint purchase was made.

20. Additionally, law enforcement has examined the surveillance video taken on or about March 29, 2017, from Business 4 at the time **MUGADDIM** purchased window tint. The video shows **MUGADDIM** talking on his cellular telephone for approximately 43 seconds. The

surveillance footage matches the date, time, and duration of a call in the Sprint cellular tower records for the cellular telephone associated with call number (202) XXX-0754.

21. Through analysis of cellular location data associated with call number (202) XXX-0754 collected from October 19, 2017, to December 13, 2017, investigators were able to corroborate that **MUGADDIM** travels frequently between Washington, D.C., and Laurel, Maryland, specifically, to areas in close proximity to the robbery locations.

**Fingerprints and DNA**

22. On or about December 13, 2017, **MUGADDIM** was arrested by AACPD on a Failure to Appear warrant. **MUGADDIM**'s fingerprints were taken during processing. Also at that time, law enforcement collected a DNA sample from **MUGADDIM** pursuant to a separate federal search warrant. The DNA sample was subsequently sent to the FBI Laboratory for comparison to DNA collected at the robbery locations.

23. The FBI Laboratory confirmed that six of the latent prints lifted from the black trash bag located at the scene of the June 13, 2017, robbery matched **MUGADDIM**'s fingerprints on file with the FBI's National Friction Ridge Print Database.

24. The FBI Laboratory also confirmed that the DNA buccal sample taken from **MUGADDIM** on the day of his arrest in December 2017 matched the DNA profile located on the toothbrush and a pair of sunglasses collected from inside of the Dodge Avenger used in the April 19, 2017, robbery in Washington, D.C., and the May 25, 2017, robbery in Laurel, Maryland.

**MUGADDIM's Cellular Telephone and Statements**

25. While **MUGADDIM** was in custody, law enforcement executed a federal search warrant on the cellular telephone found on **MUGADDIM**'s person at the time of his arrest, which was the cellular telephone assigned call number (202) XXX-0754. The cellular telephone was returned to

**MUGADDIM**'s property after it was searched, and pursuant to a delayed notification authorized in that warrant, **MUGADDIM** was not then informed that his phone had been searched.

26. A preliminary review of the contents of **MUGADDIM**'s cellular telephone revealed that on or about October 5, 2017, an internet search was conducted of a news article titled "2 men armed with AK-47s rob armored truck in Northwest DC." This news article referenced the April 19, 2017, robbery discussed above. In addition, an internet search was conducted of a news article regarding an armored truck robbery that occurred on June 28, 2017, at a bank in Houston, Texas. According to the article, the Texas robbery was conducted by two unknown subjects. One of the subjects was wearing a mask and holding a handgun. The other subject was wearing camouflage and was also holding a weapon. Both were believed to have driven away in a gray SUV.

27. In addition to the internet searches, investigators located text message conversations indicating that **MUGADDIM** had recently lost a large sum of money and expected to acquire additional funds in the near future. On or about October 5, 2017, **MUGADDIM** sent a text message to a particular telephone number, stating, "Man I'm so fucked up out here shit crazy Bitch stole my last $6,500 been down in out every since smmfh." The user of the particular telephone number responded to **MUGADDIM**'s text message with, "What Bitch," to which **MUGADDIM** responded, "Who u think I WOULD let hold $10,000 of my money?"

28. In a later text message conversation on or about October 22, 2017, with a second particular telephone number, **MUGADDIM** presented plans to move into a new dwelling and stated, "I'm a probably spend like $9,000 all together that's what everything." **MUGADDIM** also sent a text message to the second phone number on or about October 5, 2017, indicating he planned to help the other individual pay overdue bills, texting "I'm a clear your name of any bills far as that bullshit dish thing and what ever else I can help you with." The other individual responded, "I know u

don't have anything but thx," to which **MUGADDIM** replied, "I'm a be able to help soon don't worry he called me today again saying he can feel it coming again just like last time only more this time." To date, investigators have been unable to locate any record of employment or wages for **MUGADDIM** during the relevant time period, leading law enforcement to believe that a portion of the funds referred to by **MUGADDIM** in the text message conversations were gained from the robberies and that **MUGADDIM** intended to participate in future robberies.

29. Further, additional text message conversations related to window tint were located on **MUGADDIM**'s cellular telephone. In a text message on or about October 9, 2017, **MUGADDIM** stated, "Just called [an individual] told him we bring him the car 2 morrow to tint so yeah it will soon he said we may go to 2 movies in one day hope so." Law enforcement believes "we may go to 2 movies in one day" is coded language for conducting armored car robberies based on the content of recorded jail calls made by **MUGADDIM** following his arrest on or about December 13, 2017. Specifically, **MUGADDIM** placed a call from the detention center on or about February 9, 2018, following an interview conducted of him by FBI Special Agent Laura Goshen earlier that morning. During the call, **MUGADDIM** informed the individual on the other end of the call that law enforcement came to talk to him that morning about two "movie joints" and **MUGADDIM** wanted the individual on the phone to come see him "911."

## CONCLUSION

30. Based on the foregoing, I respectfully submit that there is probable cause to believe that **MUGADDIM** has violated 18 U.S.C. § 1951 (Hobbs Act Robbery, Conspiracy to Commit Hobbs Act Robbery) and 18 U.S.C. § 924(c) (Using, Carrying, and Brandishing a Firearm in Relation to a Crime of Violence). I therefore respectfully request that this Court issue a criminal complaint and a warrant to arrest **MUGADDIM**.

_____
Karen Cody, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 25th day of July, 2019.

_____
HONORABLE GINA L. SIMMS
UNITED STATES MAGISTRATE JUDGE